**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MARK DICKEY, )<br> )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>MICHAEL J. ASTRUE, )<br>    Commissioner of Social Security )<br> )<br>    Defendant. ) | CASE NO.    5:10-cv-02180-GW<br><br>MAGISTRATE JUDGE GREG WHITE<br><br>**MEMORANDUM OPINION & ORDER** |

Plaintiff Mark Dickey ("Dickey") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), partially denying Dickey's claim for Disability Insurance Benefits ("DIB"), Period of Disability ("POD"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED

### I. Procedural History

On September 29, 2005, Dickey filed applications for POD, DIB, and SSI alleging a disability onset date of October 12, 2004, and claiming that he was disabled due to degenerative

disc disease of the lumbar spine and depression. His application was denied both initially and upon reconsideration. Dickey timely requested an administrative hearing.

On August 11, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Dickey, represented by counsel, testified. Ted S. Macy, an impartial vocational expert ("VE"), also testified. On October 23, 2008, the ALJ issued a partially favorable decision. (Tr. 25.) The ALJ found that prior to January 19, 2008, Dickey's 50th birthday, he was able to perform a significant number of jobs in the national economy, and, therefore, was not disabled. However, as of January 19, 2008, the ALJ found that Dickey's age re-classified him as a person closely approaching advanced age and, therefore, the regulations compelled a finding that he was disabled from that date forward. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age fifty (50) at the time of his administrative hearing, Dickey is a person "closely approaching advanced age" under social security regulations. *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). Dickey has a ninth grade education and past relevant work as a wood pallet assembler.

### *Medical Evidence*

On October 12, 2004, Dickey went to Union Hospital Emergency Room after experiencing sudden pain in his lower back while lifting wood at work. (Tr. 265-69.) He was diagnosed with lumbar strain and told he could resume work, but that he should not lift more than ten pounds, climb, bend, or stoop. *Id.*

2

On October 14, 2004, Dickey was seen at the Occupational Medicine Center of Tuscarawas County by Grant A. Mason, M.D. (Tr. 263.) Dr. Mason noted that Dickey had pain in the right low back down the inside of the right leg to the calf. *Id.* He limited Dickey to sedentary work and noted that Dickey may not lift over ten pounds. *Id.*

On October 21, 2004, Dickey was seen by Jeffrey L. Bory, M.D., for an MRI upon referral by Dr. Mason. (Tr. 270-71.) Dr. Bory noted posterior disc bulges at the L1-2, L3-4, and L4-5 levels. *Id.* He also found slight bilateral neural formanial narrowing at the L1-2 and L3-4 levels, and changes consistent with mild degenerative disc disease from L1-2 through L3-4. *Id.*

On October 28, 2004, Dr. Mason saw Dickey for a follow-up of his low back pain. (Tr. 261.) Dickey continued to complain of right-sided low back pain radiating to his right thigh. *Id.* Dr. Mason noted that Dickey suffered from aggravation of degenerative disc disease of the lumbar spine. *Id.* He limited Dickey to sedentary work with change of position as needed, and no lifting or carrying over ten pounds. *Id.*

Dickey continued to see Dr. Mason on a regular basis until July 6, 2006. (Tr. 242-63, 349-76, 402-03.) Dr. Mason consistently restricted Dickey to sedentary work. *Id.* Though there was some variation in his evaluation notes, Dr. Mason limited Dickey to lifting no more than ten pounds together with being able to change positions and take breaks as needed. *Id.* He further restricted Dickey from working around dangerous machinery while on narcotic pain medication. *Id.* In November of 2004, Dickey attempted physical therapy as directed by Dr. Mason, but he did not experience any reduction in pain. (Tr. 272-79.)

On February 22, 2005, Cynthia Taylor, D.O., examined Dickey at the request of the Bureau of Worker's Compensation. (Tr. 286-88.) Dr. Taylor found that Dickey had a limited

3

range of lumbar motion. (Tr. 288.) She also opined that Dickey could sit, stand, or walk for thirty minutes at a time, each for a total of two hours out of an eight-hour day. (Tr. 288.) In a letter dated February 24, 2005, Dr. Taylor found Dickey's limitations were such that "he is unable to lift greater than 10 pounds on an occasional basis, unable to do repetitive bending and he needs the freedom to sit and stand as needed." (Tr. 287.) She opined that Dickey had not yet reached his maximum medical improvement, that he would benefit from a pain management consultation, and that he should partake in vocational rehabilitation. *Id.*

On May 26, 2005, Dickey was seen by Mark Pellegrino, M.D., a pain management specialist. (Tr. 296-98.) In a letter to Dr. Mason, Dr. Pellegrino noted that Dickey's gait and balance were normal, although he ambulated with a mild right antalgia. (Tr. 297.) He believed that a reasonable treatment strategy would include injections, "specifically right sacroiliac block and right selective lumbar nerve block and facet injections ..." *Id.*

On July 21, 2005, a discogram was performed by Jorge Esguerra, M.D. (Tr. 282-85.) Dr. Esguerra found no signs of disc herniation. (Tr. 282-85.) Dr. Mason's notes from Dickey's July 28, 2005 appointment, however, indicate the discogram may have shown a problem at L3-4. (Tr. 245.) Dr. Mason referred Dickey back to Dr. Pellegrino for advice and direction, and furnished him with a copy of the discogram. *Id.*

After seeing Dickey for a second consultation, Dr. Pellegrino, in a letter dated September 8, 2005, addressed to Dr. Mason, opined that Dickey continued to demonstrate evidence of disc disease and right sacroiliac sprain/strain. (Tr. 295-96.) He interpreted Dickey's recent discogram as supporting a diagnosis of disc disease rather than ruling it out. *Id.*

On December 27, 2005, State Agency physician Myung Cho, M.D., completed a physical

4

residual functional capacity ("RFC") assessment. (Tr. 338-45.) Dr. Cho opined that Dickey could lift/carry twenty pounds occasionally and ten pounds frequently with an unlimited ability to push/pull within those limits. (Tr. 339.) She also found that Dickey could both sit and stand for six hours each in an eight-hour day. *Id.* Dr. Cho noted that multiple physical exams showed consistent results, including normal gait, neuro, sensation and muscle strength. *Id.* She opined that Dickey could occasionally climb ramps or stairs, but never ladders, rope, or scaffolds, and that he could occasionally stoop or crouch. (Tr. 340.) She found no other limitations. (Tr. 341-42.) Dr. Cho noted that the symptoms were attributable to a medically determinable impairment, and that the severity and duration of the symptoms were not disproportionate to the expected level of severity and duration. (Tr. 343.) She also noted Dickey's statements concerning his symptoms were consistent with his statements concerning his activities of daily living. *Id.* She noted that the opinions of other sources varied significantly from her own. (Tr. 344.) Specifically, she noted that Dr. Taylor had stated Dickey cannot lift and/or carry over ten pounds. *Id*. Dr. Cho did not believe that the objective medical evidence of record supported such a limitation. *Id*. On June 20, 2006, Malika Haque, M.D., reviewed the file and affirmed Dr. Cho's results. (Tr. 400.)

On March 2, 2006, Dr. Mason filled out a medical source statement regarding Dickey's RFC. (Tr. 347-48.) Dr. Mason noted that lifting and carrying were affected by Dickey's impairments, because he had pain with sitting, standing, and walking. (Tr. 347.) However, he also noted that no testing had been done to determine the exact extent of his limitations. *Id.* Specifically, Dr. Mason wrote that Dickey had limitations with respect to standing/walking, but asserted that there were no medical findings supporting this other than his own examinations and

5

Dickey's subjective complaints. *Id.* He further opined that Dickey could only sit for a total of four hours in an eight-hour day, but less than one hour without interruption. *Id.* He noted that Dickey was constantly moving around to find a comfortable position during examinations. *Id.* Dr. Mason checked the box indicating that Dickey needed to rest during the day, and a morning, lunch, and afternoon break at approximately two hour intervals would be sufficient. (Tr. 348.) Dr. Mason also checked the box indicating that Dickey could never climb, crouch, kneel, or crawl and could only rarely stoop, with bending limited to a twenty-degree angle. *Id.*

On July 6, 2006, Dr. Mason saw Dickey for a routine examination. He noted that Dickey could do sedentary work, but must be allowed to take breaks when needed. (Tr. 402.) On August 15, 2006, Dr. Mason filled out a second physical functional capacity statement. (Tr. 405-06.) He opined that Dickey could only lift and/or carry five to ten pounds. (Tr. 405.) He also noted that Dickey could stand and/or walk for one hour total in an eight-hour day and without interruption for fifteen minutes. *Id.* Dr. Mason opined that Dickey could sit for a total of two hours, and only twenty minutes without interruption. *Id.* Dr. Mason also stated that Dickey needed to frequently change positions to relieve discomfort and that he often did so in his presence. *Id.* Dr. Mason circled that Dickey needed to rest for some period in addition to a morning, lunch, and afternoon break scheduled at approximately two-hour intervals. (Tr. 405-06.) He noted that Dickey could never climb, balance, stoop, crouch, kneel, or crawl, and that Dickey experienced discomfort with these activities. (Tr. 406.) At the end of the statement, Dr. Mason opined that Dickey required a sit/stand at-will option, and that Dickey experienced severe pain. *Id.*

Dickey continued treatment at the Occupational Medical Center of Tuscarawas County

from October 2006 to May 2008 with different doctors.  (Tr. 408-16.)  The appointment notes and records were signed by the Medical Director, Nicholas Vararti, M.D., and co-signed by Milan Packovich, M.D., Christine Popkie, RN, MSN, C-FNP, and Louise Brewer, MSN, CNP. *Id.*  The notes from the evaluation indicate that Dickey was limited to sedentary work, that he could not lift over ten pounds, and that he should not work around dangerous machinery while taking Vicodin.  *Id.*  It was also noted that Dickey must be allowed to change positions as needed.  *Id.*  Dickey consistently reported that he walked regularly and took Vicodin to alleviate the pain, but he still had difficulty with activities including walking and driving.  *Id.*

*Hearing Testimony*

At the hearing, Dickey testified to the following:

- He wakes up at four o'clock every morning to take pain medication because of the pain he experiences after laying down too long.  He usually wakes up three to four times during the night, moves around, and lays back down.  During the day, he can only sit for a half hour before having to stand up.  He walks around for fifteen to twenty minutes until he again starts to feel pain.  He is "up and down all the time, all day long, hurting."  The pain is worse when he sits for too long or bends.  (Tr. 29, 32-33.)

- To occupy his time, he reads a paper, magazine, or book for an hour to an hour and a half each day.  He also walks down the road and back, which is about a block.  He cooks his own dinners, and bathes while his wife is at work.  (Tr. 29-30.)

- He takes generic Vicodin two to three times a day for the pain and is on blood pressure medication.  The Vicodin causes dizziness, requiring him to lay down for about an hour.  He places pillows underneath his legs to help alleviate the pain. (Tr. 31-33.)

- When he goes shopping, he leans on the cart.  He does not have any problems showering, but does have problems dressing.  (Tr. 31.)

- He has his driver's license, but has not driven in two years due to drowsiness caused by his medications.  (Tr. 31-33.)

7

- He is married and has a ninth grade education. (Tr. 30, 32.)

The ALJ posed the following hypothetical question to the VE:

Mr. Macey, I have two hypothetical[s]. If, we have here a issue with the age because Mr. Dickey turned 50 years old recently. The first will be the following. A person closely approaching advanced age with limited education and no transferable skills. He can perform the full range of light work except standing and walking is half an hour at a time in a total of three hours in an eight hour day. Sitting is six hours in an eight hour day but requires the sit/stand option every hour without leaving the workplace. Pushing or pulling is occasional, climbing stairs or ramps is occasional, cannot climb ladders or scaffolds, cannot crouch or crawl, stooping is, occasional, cannot work in heights or in proximity to moving machinery. Would there be any jobs in the regional or national economy that such a person could perform and can you tell me what numbers?

(Tr. 34.) The VE responded that there were jobs in the regional or national economy that such a person could perform. *Id.* However, the VE noted that he would have to go down to sedentary limitations because his "statistics would exclude light jobs based on the standing and walking restrictions." (Tr. 34-35.) Assuming that the hypothetical refers to a younger person, the VE testified that there were jobs the person could perform, including wire worker, DOT § 782.664-022; cashier, DOT § 211.463-010; and, final assembler, DOT § 713.687-018. *Id.* The ALJ noted that a person with the same sedentary limitations would "grid out" at fifty years of age (*i.e.,* become disabled). (Tr. 35.)

Dickey's attorney changed the hypothetical to include a sit/stand option and a requirement that such person would need to step away from the workplace for a walk. (Tr. 36-37.) The VE testified that such a requirement would preclude work if it involved more than eight to ten minutes each hour. (Tr. 37.) However, he testified that three to four minutes would probably be acceptable. *Id.*

8

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[1]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Dickey was insured on his alleged disability onset date, October 12, 2004, and remained insured through the date of the ALJ's decision, October 23, 2008. (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Dickey must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

---

[1] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Dickey established medically determinable, severe impairments, due to degenerative disc disease of the lumbar spine and major depression, moderate, single episode. (Tr. 17.) However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Dickey was found incapable of performing his past work activities, but was determined to have an RFC for a limited range of sedentary work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Dickey was not disabled prior to January 19, 2008, his 50th birthday.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.*

*Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

*Pain Evaluation and Credibility*

Dickey asserts that the ALJ failed to utilize appropriate standards when evaluating his pain. (ECF No. 8-10.)

11

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

The ALJ accepted that Dickey suffered from various severe impairments. (Tr. 17.) He found that Dickey's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible prior to January 19, 2008, to the extent they are inconsistent with the [RFC] assessment ...." (Tr. 20-21.) Thus, the ALJ essentially found that Dickey established step one of the *Felisky* test, but was not credible at the second step. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded

12

lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"). Beyond medical evidence, there are seven factors that the ALJ should consider.[2] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

The Commissioner argues that Dickey made no effort to explain how and where the ALJ's finding was deficient regarding either objective support or credibility. (ECF No. 17 at 8.) Indeed, Dickey's brief lacks any specific allegation as to how the ALJ erred in either his pain or credibility evaluations. (ECF No. 15 at 8-10.) Instead, Dickey relies on a general statement that the ALJ misapplied legal standards followed by a recitation of certain portions of the medical record and Dickey's own testimony. *Id*. Without any argument, it is unclear how the ALJ failed to conduct a proper pain or credibility analysis.

---

[2] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, Introduction; *see also Cross*, 373 F. Supp. 2d at 732.

Here, the ALJ analyzed several of the factors listed in SSR 96-7p and took these factors into account when making his determination. He discussed Dickey's daily activities; the location, duration, frequency and intensity of the pain; the precipitating and aggravating factors; and, the types, dosage, effectiveness and side effects of any pain medication, as follows:

> Turning first to the nonmedical evidence, the claimant reports chronic pain in his right lower back that radiates down the right leg [which] is accompanied by numbness and tingling in the limb. He rates his back and leg pain as ranging from 7 to 10 on a scale of 10 being the worst. His pain is increased by standing, walking, climbing stairs, sitting, lifting, reaching, kneeling, and squatting. He can bend, but is limited by pain. He can walk for about 150 feet, after which he must rest for 20 minutes. Lifting is limited between 5 to 10 pounds. His pain also affects his ability to complete tasks and interrupts his nighttime sleep. He experiences chronic stress with depression that is caused by his pain and limited physical abilities. He rates his depression as ranging from 0 to 6 on a scale of 10 being the worst. He lives with his wife and stepson and does not socialize outside his home. He can dress and maintain his personal hygiene by himself with some limitations. He performs light indoor household chores at a slow pace with rests, and does some light meal preparation. He leaves his house at least daily, drives for short distances, and will shop. He reads for recreation and follows the news. He used to fish, but his inability to sit in one spot caused him to stop. He is prescribed a narcotic pain killer that benefits him, but makes him tired and drowsy. Relief is also obtained from changing positions and the application of heat. (Exhibits IE, 4E, 5E, 9E, 13E, l6E, 19E)
>
> ***
>
> The claimant testified he is in pain as soon as he wakes and takes medication immediately. Sustained walking causes pain the entire length of his back and down his right leg. His pain is aggravated by sitting too long, bending, or walking up and down steps. He can sit for up to a half an hour; he is up and down all day long and will move around for about 15 to 20 minutes before sitting again. For recreation he takes walks of a city block's length. He continues to read, including books, the newspaper, and magazines. He cooks for himself when his wife is working. Vicodin, which he takes 2 to 3 times a day, makes him dizzy and causes him to lie down after taking it; laying down itself provides relief. He continues to go shopping with his wife. He has not driven in 2 years. He continues to sleep poorly and gets up 3 to 4 times during the night; as a result he is continually tired.

(Tr. 20.) The ALJ goes on to find that the above-mentioned impairments and symptoms are not credible as they are inconsistent with the RFC. After discussion of the opinions and statements

14

of Dickey's various doctors, which the ALJ noted were "generally consistent with one another," the ALJ found that:

> The evidence shows that the claimant experiences pain and limitations, but the medical evidence does not objectively support the degree of severity or the extent of restriction which he asserts. Although the exact extent of the claimant's limitations varies somewhat from doctor to doctor, all are in agreement that he is capable of sedentary work within the limitations set forth in the [RFC].

(Tr. 23.)

While the ALJ was not required to discuss each and every factor, it is clear that he considered many of them when making his decision. He also considered the available objective medical evidence. The Court finds that the ALJ's pain and credibility analysis was not *per se* deficient, and Dickey fails to point to any specific portion of the ALJ's opinion that is deficient under the applicable laws, rules, and regulations. As such, Dickey's first assignment of error is not well-taken.

### *Treating Physician*

Dickey also argues that the ALJ failed to accord proper weight to the opinions of his treating physician. (ECF No. 15 at 10-14.) The Commissioner contends that the ALJ reasonably considered and weighed the opinions of Dickey's treating physician together with the consultative examiner. (ECF No. 17 at 9.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent

15

with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[3]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security

---

[3] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

16

Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Dickey argues that the ALJ failed to accord proper weight to the opinion of Dr. Mason. (ECF No. 15 at 11.) Specifically, Dickey asserts that the ALJ failed to include in the RFC the opinion that Dickey required a sit/stand option with additional breaks as needed. *Id*. Dickey further asserts that such a restriction was consistent with the opinion of Dr. Taylor, who performed an independent medical evaluation for the Bureau of Worker's Compensation.[4] *Id*.

The ALJ found that, prior to January 19, 2008, Dickey could perform a limited range of sedentary work, with the ability to stand and/or walk for three hours in an eight hour work day in thirty minute increments, and sit for a total of six hours in an eight hour work day. (Tr. 19.) The ALJ also found that Dickey required "a sit/stand option every hour without leaving his work station." *Id*. Dr. Mason consistently found that Dickey could perform sedentary work, and, in his medical source statement of March 2, 2006, opined that Dickey could sit without interruption for less than one hour. (Tr. 347.) In the same statement, Dr. Mason indicated that Dickey needed additional rest periods during an eight hour work day, but a morning, lunch, and

---

[4] Dr. Taylor opined on February 24, 2005, that Dickey "needs the freedom to sit and stand as needed." (Tr. 287.) She did not offer any opinion as to whether Dickey required additional breaks. (Tr. 286-87.)

afternoon break at two-hour intervals was sufficient. (Tr. 348.)

As this Court understands Dickey's argument, he maintains the ALJ improperly rejected Dr. Mason's opinion of August 2006 that Dickey required breaks in addition to morning, lunch and afternoon breaks.[5] (Tr. 405-06.) In March of 2006, Dr. Mason felt that regular morning, lunch, and afternoon breaks would suffice. Because the ALJ rejected the August opinion on the grounds that "Dr. Mason did not offer any reason for the changed assessment," Dickey believes the treating physician rule was violated. Dickey, however, has not cited any law to suggest that an ALJ violates the treating physician rule when he is forced to choose between two inconsistent opinions offered by the same treating physician within a relatively short period of time. Where, as here, there is no explanation for the inconsistency, an ALJ cannot possibly credit both opinions. From the record, it does not appear that a medical reason for the change was recorded. Given that the March opinion was more consistent with the record as a whole, there is substantial evidence to support the ALJ crediting Dr. Mason's March opinion and using it in his RFC determination.

Therefore, Dickey's second assignment of error is not well-taken.

---

[5] While Dr. Mason's notes consistently state that Dickey needs additional breaks, only the statements of March 2006, and August 2007, attempt to clarify the precise make up of these additional breaks.

18

**VII. Decision**

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

<u>/s/ Greg White</u>
U.S. Magistrate Judge

Date: September 28, 2011.